Filed 5/20/22  P. v. Alley CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>RODGER DALE ALLEY, JR.,<br><br>     Defendant and Appellant. | F083008<br><br>(Fresno Super. Ct. No. F06906977)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Clara M. Levers and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Levy, J. and Poochigian, J.

# INTRODUCTION

In 2008, appellant Rodger Dale Alley Jr. was convicted after a jury trial of first degree murder and sentenced to 25 years to life plus two years for prior prison term enhancements. His conviction and sentence were affirmed on direct appeal.

In 2021, Alley filed a petition for resentencing pursuant to Penal Code[1] section 1170.95, and asserted he was not the actual killer, he was convicted under the felony-murder rule and/or the natural and probable consequences doctrine, and he could not be now convicted of first or second degree murder because of the amendments to sections 188 and 189. The court denied the petition and found he was ineligible for relief.

On appeal, Alley argues the matter must be remanded because the court failed to appoint counsel, allow for briefing, or conduct a hearing to fully develop the record and determine whether he made a prima facie case for relief, as required by section 1170.95. We find the court's statutory errors were not prejudicial and affirm.

# FACTS[2]

At 7:15 a.m. on Sunday, June 11, 2006, an officer from the California Highway Patrol responded to a dispatch about a vehicle blocking the road. He discovered a blue

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] As will be explained below, Alley was initially tried for murder with three codefendants; the jury was unable to reach a verdict on the murder charge against Alley, and a mistrial was declared as to his case. At Alley's second jury trial, he was the only defendant, and he was convicted of first degree murder. This court's opinion in Alley's direct appeal did not contain a full factual statement of the evidence leading to Alley's murder conviction since it was limited to Alley's appellate contentions that his right to represent himself was violated and whether the reasonable doubt and conspiracy instructions were erroneous as a matter of law.

When Alley filed his petition for resentencing under section 1170.95, the People filed an opposition that included as exhibits this court's opinion from his direct appeal and the complete set of instructions given to the jury at his second trial that resulted in his first degree murder conviction.

In the instant appeal from the denial of his section 1170.95 petition, this court granted the People's unopposed motion to incorporate by reference the entirety of the

pickup truck was abandoned in the middle of Central Avenue in a rural area of Fresno County. The key was in the ignition, but the vehicle could not start, and no one was present. There were sleeping bags, blankets, and construction equipment in the truck's bed. The vehicle was towed to a tow yard.

On Monday, June 12, 2006, the owner of the tow yard contacted the police because he found a dead body in the truck's bed. The police arrived and found the body of Courtney Rice in the truck's bed, lying face down amidst sleeping bags, blankets, and other items. A black, plastic garbage bag was over her head. When that bag was removed, a white plastic bag was also over her head and a yellow towel was near her face. There were multiple strips of black adhesive electrical tape on her head and in her hair.

The victim's hands were restrained behind her back with handcuffs, and her pants were pulled down. Her ankles were also restrained in handcuffs, and a white extension cord was wrapped around her legs. The victim's face was swollen, and her body decomposed. Rice was identified by her fingerprints.

The police returned to the rural location where the blue truck had been abandoned, and they found a love seat had been dumped in the orchard across the street. A large hole had been dug near the love seat.

---

record from Alley's direct appeal that affirmed his murder conviction, in *People v. Alley*, May 11, 2010, F055786.

Since this court granted the motion to incorporate the record from his direct appeal in case No. F055786, the following factual statement is from the evidence introduced at Alley's second jury trial that resulted in his first degree murder conviction.

Judge Gary Orozco presided over Alley's first and second jury trials, and he also denied his section 1170.95 petition. We recite the facts to provide context for the court's denial of his petition and the parties' arguments in this appeal. As will be explained below, we will not rely on the factual summary to resolve the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

**Cause of Death**

The pathologist determined Rice had been dead for two to three days. The handcuff marks and contusions on her wrists and ankles indicated she had been bound for some time, and the marks occurred before death. There were clearing marks around the victim's mouth, consistent with electrical or some type of tape. There was no evidence of strangulation.

There was a hemorrhage below the right side of Rice's scalp consistent with blunt force trauma inflicted prior to death, but it was not the cause of death. An injury to her right lip was consistent with blunt trauma, consistent with a towel being pushed into her face to try and smother her. There were low amounts of alcohol and methamphetamine in her system.

The pathologist determined the victim's cause of death was "probable asphyxia due to binding and gagging," meaning a lack of oxygen or an increase in the carbon dioxide level in the blood. The pathologist testified that when he examined the victim's body in the truck bed, she was lying face down on her belly and her abdomen was compressed, which meant the person's breathing was compromised at the time of death. "[A] restrained asphyxia [occurs] when somebody's restraining this way with the hands being handcuffed from behind, and … both the legs are held together by another pair of handcuffs, and having been found on the belly, this compromises the person to breathe. The main muscle in the body is the diaphragm, which separates the chest organs from the abdominal organs. That cannot move when somebody is laying on the belly. A normal person will move or get up or do everything to get out of that position. However, if … you have handcuffs from behind, and laying on the belly as it is, the legs being tied, you cannot move to a different position, so if you leave a person in this position for a long time, the person can … build up asphyxia and ultimately can die that way."

**The Investigation**

Michelle Molina's fingerprints were on the black plastic garbage bag that was over the victim's head. Joseph Lopez's fingerprints were on the black electrical tape found in the victim's hair.

The blue truck belonged to a construction company, and it had been in the possession of an employee, Richard Juarez, who was Joseph Lopez's brother. Lopez lived with Juarez and had a key to his house. Juarez had parked the truck at his house on West Swift Avenue on Friday, June 9, 2006, and left construction equipment in the truck's bed. The truck was still there on Saturday night, June 10, but Juarez discovered it was gone on the morning of Sunday, June 11, 2006. The sleeping bags and blankets found in the truck's bed had not been there when Juarez parked the truck at his home on Friday.

**Michelle Molina's Apartment**

On June 12, 2006, an officer responded to a second floor apartment (No. 212), located in an apartment complex on North Fruit, in response to a call that the occupant of the apartment may have been the female found in the pickup truck. The apartment's front door appeared to have been kicked in. No one was present when the officer arrived, but it was later determined that Michelle Molina lived there.

Inside the apartment, there was a blood smear near the front door that was over a foot long. A mop in the kitchen had blood on it. There was an off-white stain on the living room carpet and an empty box of black plastic garbage bags with yellow drawstrings, consistent with the bag found over the victim's head.

A mirror was lying face up on the living room floor, and there was a piece of black electrical tape on it. The fingerprints of Rodger Dale Alley, Jr. and Joseph Lopez were found on the mirror.

5.

In the bathroom, a black plastic garbage bag with yellow ties was at the base of the bathtub; it was similar to the black bag over the victim's head. Michelle Molina's fingerprints were found on the black plastic bag found in the bathroom.

Inside the bathtub, there was a six-inch piece of electrical tape in the drain, and hair strands were on the tub's side. The DNA profile from the hair strands were consistent with Rice's DNA profile.

In the southeast bedroom, there was a mattress on the center of the floor, several stains on the carpet, and brushing or rubbing marks on a one-foot-square stain.

In the southwest (master) bedroom, there were black plastic garbage bags with yellow ties on top of the bed. There were various items of paraphernalia related to the Bulldog criminal street gang in the room.[3] A brush with a bottle of stain remover, and a garbage can with a black electrical cable and a knotted white cord, were also in the room.

The officers found numerous green pellets throughout the apartment.

**Arrest of Lopez**

Also on June 12, 2006, Joseph Lopez was arrested while standing near a Chevrolet Malibu. Lopez threw some keys into the bushes just before he was arrested. The keys were recovered and consisted of a handcuff key, and the keys to the Chevrolet. A canister with hundreds of green plastic BBs was in the car's trunk.

Richard Juarez's home on West Swift was searched. A box was in the backyard, and it contained used pieces of black electrical tape rolled up into balls, with hair attached to the pieces. The fingerprints of Lopez and Rice were found on the tape.

---

[3] A detective testified as the prosecution's gang expert that Lopez and Molina were members of the Eastside Fresno Bulldogs; Elbert Vargas, another codefendant, was a member of the Northside Fresno Bulldogs; Alley was a member of the Lewis Street Bulldogs; the Bulldogs are a criminal street gang; and the murder was conducted for the benefit of the Bulldog gang. While the jury convicted Alley of first degree murder, it found the gang special circumstance and gang enhancement were not true.

**Sylvester Carter's Trial Testimony**

Sylvester Carter testified for the prosecution that he was a member of the Diamond Crips. He knew Courtney "Baby" Rice, the victim; and codefendants Joseph "LB (Little Bulldog)" Lopez, Rodger "Drifter" Alley, Michelle Molina, and Elbert "Smoker" Vargas. He knew Lopez was a member of the Bulldog gang, he believed Molina was also a member because she had a lot of gang paraphernalia, and Lopez and Molina were in a relationship. He did not know if Alley was a gang member.

Carter had prior felony convictions for burglary, grand theft auto, and resisting arrest, and had been in prison many times. He used crack cocaine, described himself as a " 'crack head,' " and committed burglaries to support his drug use. Carter testified that he entered into an agreement to testify truthfully in this case; he pleaded guilty to rape and attempted rape of Rice with gang enhancements; and he could be sentenced to between 16 to 21 years in prison.

Carter testified he went to Molina's second floor apartment on North Fruit on the evening of June 9, 2006, so he could use drugs. When he arrived, the door was ajar, and he walked inside. Lopez and Molina met him, and Vargas was sitting on a couch. Carter believed Lopez and Molina were "a couple."

Lopez was holding a sawed-off shotgun with a pistol grip, and told him, " 'You don't want to be here right now, we doing something serious.' " Carter pushed his way inside because he wanted to get high and thought the others just did not want him there. He saw Courtney Rice on the floor, leaning against the hallway wall. Her hands were cuffed behind her back, and handcuffs were on her feet. He later realized there was black tape around her eyes.

Lopez told Carter that Rice had been "running her mouth." Carter thought that meant she had been talking about illegal activities. Lopez told Carter to hit or kick Rice to show he was willing to go along. Carter kicked her in the back. Carter and Vargas used crack cocaine provided by Lopez.

7.

Carter said he smoked a lot of crack that night, but he remembered everything that happened. Carter testified that Alley and Maria Coronado arrived at the apartment. Lopez and Molina met them at the door, and they seemed worried about Coronado seeing Rice. Lopez told Coronado, " 'I got to make sure you're with this program,' " and told her to hit or kick Rice. Alley told Coronado something like, "[C]ome on, let's … just get it over with, and let's go in the back…." Carter thought Alley was anxious to go into Molina's bedroom and use drugs.

Coronado said she was a gangster and saw this type of thing all the time, and she kicked Rice in the back. Alley put his boot on Rice's face, placed his hands on the wall for leverage, and rubbed his toe in her face, and Rice moaned.

Carter testified that Alley, Coronado, Lopez, and Molina went into Molina's (southwest) bedroom. Carter and Vargas were in the living room, and Rice remained in the hallway.

Lopez walked out of Molina's bedroom with Alley and Coronado. Carter testified that Lopez directed him to have anal intercourse with Rice. Carter initially declined. Lopez and Molina forced Rice into the bathroom, removed her handcuffs and clothes, and Molina washed her in the bathtub.

Carter testified Alley and Coronado left the apartment. Rice was removed from the tub, again placed in handcuffs, and Carter dragged her into the southeast bedroom. Lopez again told Carter and Vargas to have sex with Rice, and then Lopez left the apartment to get more drugs.

Carter testified Vargas went into the southeast bedroom, left the room, and then Carter went inside. Carter testified he did not complete a sexual act with Rice but wanted the others to think he did.

When Carter left the bedroom, only Molina and Vargas were in the apartment. Molina went into the southeast bedroom, and Carter could hear her yelling at Rice. Molina was also punching and kicking Rice.

8.

Carter testified that at one point, Rice was begging for water. He moistened a towel and put it to her lips.

Lopez, Alley, and Coronado returned to the apartment. Lopez asked Rice about having sex with Carter and Vargas, and then he gave drugs to Carter and Vargas.

Carter testified that Alley, Lopez, Coronado, and Molina went into Molina's (southwest) bedroom. Carter believed Alley and Coronado were a couple. Carter joined them and everyone was using drugs. Carter, Lopez, and Vargas walked between the two bedrooms, and they were using "crystal" and "crack."

Lopez was firing green pellets at Rice from an Airsoft gun. At one point, Lopez pointed to Rice and asked Carter, "What do you think we should do?"

Carter testified that around dawn (Saturday), he was in the southeast bedroom with Alley, Lopez, and Rice. Alley and Lopez began talking. Carter left the bedroom and went to the balcony off the front door to smoke with Molina and Coronado.

Carter went back inside, and the door to the southeast bedroom was closed. He could hear the muffled voices of Lopez and Alley inside that bedroom. Carter went back to the front door balcony but discovered Molina, Coronado, and Vargas were downstairs. He joined them on the first floor walkway in front of the apartment building.

Carter testified there was music already being played in Molina's apartment, and it became much louder. Carter heard Rice screaming and yelling, "[N]o, stop, help." Carter heard thumping noises that sounded like someone kicking or stomping the ground, and the windows sounded like they were being shattered. These sounds went on for three to four minutes.

Carter testified Lopez and Alley were still in the apartment when he heard the loud music, stomping, and yelling. Carter was standing downstairs, next to Molina, when he heard these sounds. Molina told Carter, "[Y]ou better not run," and he told her the same thing. Carter saw a maintenance man from the apartment complex walking toward them. He became frightened and ran away.

9.

Later that day, Lopez called Carter and arranged a meeting at a Motel 6. Carter went to the motel with two women. Vargas was already there, and Alley, Lopez, and Coronado also arrived.

Carter testified that at some later point, he was at an apartment complex near the one where Molina lived, and he was waiting for his "connection." Lopez and Vargas drove by in a white Chevrolet Malibu. Lopez was driving and had a shotgun in his lap, said they had to find a truck, and he also wanted to get some money to get high. Carter convinced Lopez to trade the shotgun to his "connection" in exchange for drugs. Carter got into the Chevrolet with Lopez and Vargas, and they went to the apartment complex where Molina lived. Lopez's brother arrived in another vehicle, appeared angry, and Lopez left with him.

**Maria Coronado's Trial Testimony**

Coronado pleaded no contest to being an accessory after the fact and admitted a gang enhancement in this case; she pleaded guilty in another case to possession of a controlled substance while armed with a firearm, for a stipulated sentence of five years on condition that she truthfully testify.

Coronado testified she previously dated Alley's brother, and she had an intimate relationship with Alley. She knew Alley was a member of the Bulldog gang. She regularly used methamphetamine and sold drugs.

On the night of June 9, 2006, Alley called Coronado because he wanted to use methamphetamine and asked if she had any. Coronado said yes. Alley told her to pick him up at a certain location by an apartment complex. When she arrived, Alley and Vargas got into her car. Coronado drove around for 45 minutes while Alley and Vargas called people to find a place where they could use drugs. Vargas told her to drive back to the apartment complex where she picked them up.

Coronado parked at the apartment complex and followed Alley and Vargas upstairs to Molina's second floor apartment. Alley told Coronado that he really did not

10.

want to take her there because his girlfriend was there.  Coronado said she did not care, and Alley could tell his girlfriend that she was his cousin.

Coronado followed Alley and Vargas inside the apartment.  Carter was sitting on the couch and holding a sawed-off shotgun.  Molina was sitting on the hallway floor.  Rice was lying on her stomach on the hallway floor, next to Molina.  There was black tape over Rice's mouth, and she was blindfolded.  Her hands were cuffed behind her back, and there were handcuffs on her ankles.  Lopez was firing BB pellets at Rice, and Rice flinched when the pellets hit her body.

Coronado testified the atmosphere in the apartment was very tense.  Molina was angry and yelling at Rice.  Coronado followed Alley into the southeast bedroom.  Lopez was sitting on a mattress on the floor.  Lopez was upset that Alley brought Coronado to the apartment.  Alley replied that Coronado was "cool."  Lopez told Coronado that Rice was in this situation because she was going to "snitch."

At trial, Coronado admitted she had previously testified under oath that both Lopez and Alley told her that Rice was in that situation because she was going to snitch.[4]  Coronado claimed she did not tell the truth in that prior testimony, insisted that only Lopez said it, but admitted Alley was present when Lopez made the statement.  Coronado testified that she felt that she could not leave, or she could also be treated like Rice.

Coronado and Alley smoked methamphetamine in the southeast bedroom, and then went into the southwest bedroom.  Coronado did not see Rice, but she saw Molina running water in the bathtub and the shadow of someone in the tub.

Coronado testified that she did not recall her prior statement to investigators, that she told Alley she did not want to stay, and everyone looked at her in a panic.  She

---

**4** When Coronado testified on direct examination, the prosecutor repeatedly used the transcript of her prior testimony at Alley's first trial, and her prior statements to the police, to impeach her prior inconsistent statements.  Each time, Coronado claimed she lied during her prior testimony or in her prior statements.

testified Lopez asked Alley why he brought Coronado there. Coronado did not remember her prior statement, that Lopez also told Alley that Alley knew what was happening there. Alley told Lopez it was okay.

Coronado testified that she asked Alley what was happening. Lopez said, " 'You just don't know how us gangsters do it, how us gangsters really get down.' " Coronado knew Lopez was a member of the Bulldog gang. Coronado had also been in the Bulldogs when she was younger.

Coronado testified that Lopez asked Alley to go into the southeast bedroom with him, and Alley did so. Coronado stayed in the southwest bedroom with Molina and suggested they could leave by claiming they needed to buy some beer. Coronado and Molina went to the balcony off the front door to smoke. Coronado did not see Rice in the bathroom, kitchen, or living room when she went outside.

Coronado and Molina returned to the apartment and went into the southwest bedroom. Coronado heard loud rap music from behind the closed door of the southeast bedroom. Carter and Vargas were in the living room but went into the southeast bedroom. She had not seen Lopez or Alley leave the apartment. All of the men were in the bedroom with Rice for 30 to 60 minutes. Carter joined the two women in the southwest bedroom. Vargas went into the living room.

Coronado testified Lopez left the southeast bedroom and told Molina and Coronado to keep an eye on Carter and Vargas. Alley also left the southeast bedroom. Coronado admitted that she had previously testified that both Lopez and Alley told the two women to watch Carter and Vargas. She claimed that her prior testimony about Alley was not truthful.

Coronado testified that she left the apartment around 3:00 or 4:00 a.m. on Saturday because she was angry. Alley, Lopez, Molina, Carter, and Vargas were still in the apartment, but she did not see Rice. Coronado told Alley that she was going home to change her clothes.

12.

Coronado admitted she previously stated that Alley called her after she left, she told him she did not want to go back to the apartment, and Alley told her to hurry up and return. Coronado insisted that Alley instead told her not to go back to the apartment and he did not want her there.

Coronado testified that she returned to Molina's apartment around 5:00 or 6:00 a.m. Coronado admitted she previously testified that Alley said she had to come back to the apartment, and he was waiting for her in the apartment's carport when she returned. Coronado claimed that did not happen and she lied about it.

Coronado testified Alley was not at the apartment when she returned. Vargas was asleep on the couch. Coronado went into the southwest bedroom, and Lopez and Molina were there. Rice was lying on the floor of the southeast bedroom, with handcuffs on her ankles.

Coronado admitted she previously testified that when she returned to the apartment, Alley was in the southwest bedroom with Lopez and Molina; Coronado claimed she lied when she said that.

Around 7:00 a.m. on Saturday, Carter went into the southeast bedroom where Rice was. There was already music playing from that room, and the music became louder. Lopez also went into the southeast bedroom and the music became even more loud. Vargas then went into the southeast bedroom. They were there for 30 minutes with the door closed.

Coronado admitted that she previously testified that Alley also went into the southeast bedroom with Lopez, Carter, and Vargas. Coronado again claimed she lied about that.

Coronado testified she went outside with Molina to smoke and then returned to the southwest bedroom. The door to the southeast bedroom was still closed, and she did not see anyone in the living room, kitchen, or bathroom. Carter and Lopez left the southeast bedroom. Lopez was carrying the shotgun, and said, " 'This bitch … is going to have to

13.

die.' " Coronado heard a woman in the southeast bedroom screaming. Coronado claimed Alley was not in the apartment when this happened.

Coronado admitted she previously testified that both Alley and Lopez walked out of the southeast bedroom, and Alley was present when Lopez made the statement that she had to die. Coronado again claimed she previously lied about that. Coronado also admitted that she previously told investigators and testified under oath that Lopez called Alley back into the southeast bedroom; she again claimed she lied about that.

Coronado testified that she heard a woman screaming in the southeast bedroom. Coronado and Carter were in the southwest bedroom. Coronado, Molina, and Carter went downstairs and smoked. Carter left the apartment complex.

Coronado was still outside and heard thumping sounds coming from Molina's apartment, like someone was jumping up and down, and the apartment's windows were vibrating with the thumping sounds. Coronado also heard Rice screaming in panic. Lopez walked out of the apartment and met Coronado and Molina downstairs. Molina told Lopez that Carter left. Lopez was upset and told Molina that he was going to look for Carter.

Coronado admitted she previously told investigators, and testified at the prior hearing, that after she heard the screaming and stomping, both Lopez and Alley walked out of the apartment and went downstairs to join Molina and Coronado. Coronado further admitted she previously testified Alley was red and sweaty, and said he was hot; and Alley said that no matter what they did, Rice would not die, and she was still breathing. She also previously testified that Alley and Lopez were mad that Carter left, Alley and Lopez yelled at the women about Carter leaving, and Alley went back into the apartment. Coronado again claimed she did not tell the truth in her prior testimony, she lied about Alley's presence and statements, and that Vargas was the man who was red and sweaty, and made the statement that Rice would not die.

14.

Coronado testified Lopez left the apartment complex to look for Carter. She went back into the apartment with Molina. Vargas and Rice were still inside, and Coronado claimed Alley was not there.

Coronado admitted she previously testified that Alley also went back into the apartment and entered the southeast bedroom, and the screaming and stomping started again. Coronado admitted she previously testified that the screaming and stomping stopped, Alley walked out of the bedroom, and he told Coronado that he was trying to come up with a story. Coronado again claimed she lied in her prior testimony, insisted Alley was not there, and Vargas was the man who went into the bedroom when the stomping started again.

Coronado testified that she left the apartment and got into her car. Alley returned to the apartment complex and joined her in the car, and they waited for Molina and Vargas. After waiting, Alley went upstairs to the apartment to call them, and then returned to the car and acted "antsy." Molina left the apartment, and she was carrying a duffle bag; she put it in the trunk of Coronado's car. Molina went back to the apartment and then returned to Coronado's car. Vargas appeared from the ground floor area of the apartment complex and got into Coronado's car.

Coronado admitted that she previously told the police and testified that she asked Alley if she could leave the apartment; Alley decided they would leave. She testified that Alley talked about coming up with a story about where they were in case something happened, and he decided they would say they were never there and did not know any of the people involved; they had to keep their stories straight. Coronado again claimed she previously lied about these statements.

Coronado testified she drove to a Chevron market with Vargas, Alley, and Molina because she wanted to buy a beer. She admitted that she previously testified Alley told her to stop at the store so all four people would be seen on the store's security camera, and again claimed she lied in her prior testimony.

15.

Coronado testified that when they left the gas station, they went to the home of Molina's cousin and then to a home of a friend of Alley and Vargas. Coronado borrowed money from the friend and rented a room at Motel 6. They talked about the body at Molina's apartment. It was decided that Coronado and Molina would clean the apartment, and that Alley and Vargas would get rid of the body. Coronado drove Molina to her mother's house, where Molina picked up the spare key to her own apartment.

Coronado admitted she previously testified that Alley told Coronado and Molina that they had to clean the apartment, and Alley led the discussion about who would get rid of the body.

Coronado testified that she drove to a store with Molina, they bought cleaning supplies and plastic trash bags, and returned to the apartment. Coronado and Molina tried to clean the blood and fluids from the apartment's floors and walls, and they wiped the doors and handles for fingerprints. Coronado testified Rice's body was in the southeast bedroom, a towel was on her face, her pants were pulled down, and her legs were still handcuffed together. Rice's arms were not restrained. Lopez arrived at the apartment and packed his belongings in a duffle bag.

Coronado and Lopez went back to Motel 6, while Molina continued to clean the apartment. Vargas was at the motel, and Alley and his girlfriend later arrived. Coronado left the motel and attended her cousin's birthday party. She left the party at 2:00 a.m. and returned to the motel. Coronado admitted she previously testified that Alley told her she had to return to the motel; she again claimed she had lied.

Coronado testified that she later drove back to the apartment. Molina, Lopez, and Vargas were there with an unknown female who was driving a white Chevrolet Malibu. Alley arrived at the apartment complex and saw Coronado in the parking lot. Alley hit Coronado in the chin, and said she was stupid to be there. Coronado admitted she previously testified that Alley hit her because he wanted her to stay at the apartment; Coronado claimed she lied about that.

16.

Coronado testified that Craig Mills was also at the apartment, and Alley was upset that too many people were getting involved.[5] Coronado admitted that she previously testified that Alley told her to do what he said, or she would end up like Rice. Coronado again claimed she lied in her prior testimony.

Coronado testified that Alley left the complex, and Coronado went upstairs to the apartment. Lopez, Molina, Vargas, and Craig Mills were inside. Rice's body was on a love seat. Lopez and Mills were trying to move the love seat out of the apartment, but Rice's body fell off. Lopez and Mills dragged the body into the living room, put it on a futon, and rolled it up. They carried the body downstairs and put it in the back of a blue truck. They also loaded the love seat into the truck's bed.

Lopez told Coronado to get into the truck with Molina. Lopez got into the white Chevrolet, along with Vargas, Mills, and the unknown female. Molina drove the truck and followed Lopez to his mother's house, where he picked up a gas can. The unknown female stayed at Lopez's mother's house. Coronado got out of the truck and sat in the Chevrolet, because Molina was hysterical and driving crazy. Lopez decided Coronado could stay in the Chevrolet and told Mills to get into the truck with Molina.

Coronado testified that the two vehicles drove to a convenience store, and Lopez filled the gas can. Molina drove the truck onto Highway 99 and got off at Central Avenue, and the Chevrolet followed the truck. Lopez called Molina and directed her to drive into an almond orchard and stop there. Lopez, Vargas, and Mills grabbed shovels from the truck and started to dig a hole in the orchard. After about 15 minutes, Coronado warned that a car was coming. They threw the shovels in the back of the truck, everyone got back into the vehicles, and the two vehicles split up.

---

[5] Mills was separately charged with being an accessory after the fact (§ 32) but he was not tried with the other codefendants.

17.

Coronado testified that Lopez drove the Chevrolet to her house, where they ate and used crack. Lopez and Vargas left the house on Sunday morning, and Coronado did not join them.

Coronado admitted that she told her lawyer and the police investigators that she did not want to testify because Alley threatened her and her family, Alley passed the threats to her through another prisoner, Alley said that he hoped she would not testify, and she was " 'going to have to pay' " if she crossed him twice. Coronado claimed she lied about these statements and there were never any threats.

Detective Todd Frazier testified that he met with Coronado just prior to the start of Alley's second trial. Coronado was in custody at that time and said she had been threatened. Coronado "was very concerned, scared, and stated she didn't want to testify."

**Defense Evidence**

Alley testified at trial and admitted he had prior convictions for vehicle theft, receiving stolen property, and evading an officer, and he had been released from prison on June 8, 2006. Alley admitted he was at Molina's apartment, but "called several witnesses, and presented cellular phone records and other evidence" to support his testimony "that he did not kill Rice and was not present at Molina's apartment when the alleged crimes took place. [Alley] also claimed he did not help move or dispose of Rice's body, although he initially agreed to help after he learned she was deceased." (*People v. Alley*, *supra*, F055786, at p. 3.)

### PROCEDURAL BACKGROUND[6]

On November 28, 2006, an information was filed in the Superior Court of Fresno County charging codefendents Rodger Dale Alley Jr., Joseph Lopez, Michelle Molina, Elbert Vargas, Sylvester Carter, Jr., and Maria Coronado with count 1, first degree murder of Rice (§ 187, subd. (a)) with the gang special circumstance (§ 190.2,

---

[6] The following procedural background is taken from the instant appellate record, and the record and opinion in Alley's direct appeal in case No. F055786.

18.

subd. (a)(22)) and the felony-murder-rape special circumstance (§ 190.2, subd. (a)(17)); and count 4, false imprisonment by violence of Rice (§ 236).

All defendants except Coronado were charged with count 2, forcible rape of Rice (§ 261, subd. (a)(2)); and count 3, attempted forcible rape of Rice (§§ 664, 261, subd. (a)(2)), with tying/binding enhancements (§ 667.61, subd. (b)). There were gang enhancements alleged as to all counts.

On August 7, 2007, the matter was assigned to Judge Orozco for all purposes.

**Plea Agreements**

On September 27, 2007, Coronado entered into an agreement to plead guilty to being an accessory after the fact and admit a gang enhancement, for a stipulated term of five years, upon completion of giving truthful testimony against the codefendants.

On November 13, 2007, Carter entered into an agreement to plead guilty to count 2, forcible rape, and count 3, attempted forcible rape, and admit the gang enhancements; and also plead guilty to charges in an unrelated case for a sentence between 16 to 21 years, upon completion of giving truthful testimony against the codefendants.

On January 7, 2008, a first amended information was filed that charged codefendants Alley, Lopez, Molina, and Vargas with the same four counts and special allegations; Coronado and Carter were no longer charged.

**Alley's First Trial**

On January 8, 2008, the joint jury trial began for codefendants Lopez, Alley, Vargas, and Molina. Carter and Coronado testified as prosecution witnesses.

On February 21, 2008, the jury returned its verdicts.

As to Alley, the jury was unable to reach verdicts for count 1, murder, and count 4, false imprisonment by violence, and the court declared mistrials on those counts. Alley was found not guilty of count 2, forcible rape, and count 3, attempted forcible rape.

19.

Lopez was convicted of count 1, first degree murder with both special circumstances found true; count 3, attempted forcible rape with the tying/binding allegation; and count 4, false imprisonment by violence, with the gang enhancements found true for all counts. He was found not guilty of count 2, forcible rape.

Molina was found not guilty of count 1, murder, but convicted of the lesser offense of involuntary manslaughter with the gang enhancement. As to Vargas, the jury found him not guilty of count 1, murder, but was unable to reach verdicts on the lesser offenses.

Molina and Vargas were convicted of count 3, attempted forcible rape, with the tying/binding allegation, and count 4, false imprisonment by violence, with gang enhancements for both counts. They were found not guilty of count 2, forcible rape.

**Alley's Second Trial**

Prior to the start of his second trial, the court granted Alley's motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806.

On May 12, 2008, Alley's second jury trial began on count 1, murder, and count 4, false imprisonment. Judge Orozco again presided over the trial, and Alley was tried by himself.

**The Jury Instructions[7]**

At Alley's second trial, the jury was instructed on aiding and abetting with CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he or she may have *directly committed* the crime. I will call that person the perpetrator. Two, he or she may have *aided and abetted a perpetrator*, who directly committed the crime. A

---

[7] As previously noted, the People's opposition to Alley's petition included a complete set of jury instructions given at Alley's second trial that resulted in his murder conviction; and the instructions are also before this court in the record from his direct appeal in case No. F055786.

person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." (Italics added.)

CALCRIM No. 401 stated:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; 2. *The defendant knew that the perpetrator intended to commit the crime*; 3. Before or during the commission of the crime, *the defendant intended to aid and abet the perpetrator in committing the crime*; and 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime *if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime*.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor." (Italics added.)

CALCRIM No. 404 addressed voluntary intoxication and aiding and abetting: "If you conclude that the defendant [Alley] was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant: A. *Knew* that Joseph Lopez, Michelle Molina, Elbert Vargas or Sylvester Carter *intended to commit murder*; and B. *Intended to aid and abet* Joseph Lopez, Michelle Molina, Elbert Vargas or Sylvester Carter *in committing murder*. Someone is intoxicated if he or she used any drug, drink, or other substance that caused an intoxicating effect." (Italics added.)

The jury received CALCRIM No. 334, that it had to decide whether Carter and Coronado were accomplices before it could consider their testimony, and that accomplice testimony must be corroborated.

CALCRIM No. 416, evidence of uncharged conspiracy, stated: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish

21.

the goal of the conspiracy." To prove defendant was a member of a conspiracy, the People had to prove that defendant "intended to agree and did agree with Joseph Lopez, Michelle Molina, Elbert Vargas, Sylvester Carter, or Maria Coronado to *commit murder and false imprisonment*," and "[a]t the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder and false imprisonment." As will be discussed below, the instruction listed several specific overt acts.

CALCRIM No. 416 continued that for the jury to decide whether Alley and one or more alleged members of the conspiracy intended to commit murder and false imprisonment, the jury had to refer to the separate instructions defining those offenses.

"The People must prove that the members of the alleged conspiracy had an agreement *and intent to commit murder and false imprisonment*. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit one or more of those crimes. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime." (Italics added.)

CALCRIM No. 416 further stated: "*The People contend that the defendant conspired to commit one of the following crimes: Murder or False Imprisonment*. You may not find the defendant guilty under a conspiracy theory *unless all of you agree that the People have proved the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit*. You must also all agree on the degree of the crime." (Italics added.)

The jury received CALCRIM No. 520 on murder: "The defendant is charged in Count 1 with murder in violation of … section 187. To prove that the defendant is guilty of this crime, the People must prove that: 1. *The defendant committed an act that caused the death of another person*; AND 2. When the defendant acted, he had a state of mind

22.

called malice aforethought." This instruction also defined express and implied malice. (Italics added.)

CALCRIM No. 521 further stated that Alley was guilty of first degree murder "if the People have proved that he acted willfully, deliberately, and with premeditation. *The defendant acted willfully if he intended to kill.* The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death." (Italics added.)

Also as to murder, the jury received CALCRIM No. 625, voluntary intoxication: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way," to decide "*whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation.*" (Italics added.)

The jury was instructed on the gang special circumstance for murder and the gang enhancements for murder and false imprisonment.

The jury was not instructed on the felony-murder-rape special circumstance, the felony-murder rule, the natural and probable consequences doctrine, or any underlying offenses aside from the elements of the charged offenses of murder and false imprisonment by violence.

**Conviction and Sentence**

On June 12, 2008, the jury found Alley guilty of count 1, first degree murder; it found the gang special circumstance and gang enhancement were not true.

Alley was found not guilty of count 4, false imprisonment by violence. The court found two prior prison term enhancements true.

On July 28, 2008, the trial court denied Alley's new trial motion and sentenced him to 25 years to life for first degree murder, plus two consecutive one-year terms for the prior prison term enhancements.

23.

**Direct Appeal**

On May 11, 2010, this court affirmed Alley's conviction and sentence in his direct appeal. (*People v. Alley*, *supra*, F055786.) We rejected his arguments that the court erroneously denied his motions pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, that were prior to his first trial. As to his second trial, we rejected his claims that the use of physical restraints on him, when he represented himself, violated his constitutional rights to due process, a fair trial, and self-representation; the court did not impermissibly burden his right to testify by requiring him to comply with a question/answer format rather than in a narrative form; and the court did not erroneously instruct on the burden of proof and reasonable doubt standards. (*People v. Alley*, *supra*, F055786, pp. 4–12, 14–22.)

We also rejected Alley's argument that his murder conviction had to be reversed because the conspiracy instructions allowed the jury to convict him based on overt acts that occurred after the homicide. We noted the jury received CALCRIM No. 416, that stated in relevant part, that a member of a conspiracy was criminally responsible for the acts or statements of any other member of the conspiracy, done to help accomplish the goal of the conspiracy, and the People had to prove that Alley, or Lopez, Molina, Vargas, Carter, or Coronado, or all of them, committed at least one of the following overt acts "to accomplish Murder and False Imprisonment." (*People v. Alley*, *supra*, F055786, pp. 12–14.) These overt acts were selecting a victim, obtaining handcuffs, obtaining tape, bathing the victim, obtaining a yellow towel, obtaining plastic garbage bags, cuffing and uncuffing the victim at various times, disrobing the victim, moving the victim to different locations within the apartment, "kill[ing] or assist[ing] in killing the victim," plus acts that occurred after the homicide, including obtaining cleaning supplies, cleaning the apartment, obtaining a vehicle to dispose of the body, and attempting to dispose of the body. (*Id*. at pp. 13–14.)

This court held that any error in listing overt acts that occurred after the murder was harmless because "[t]he commission of the target offense in furtherance of a

24.

conspiracy necessarily satisfies the overt act requirement," and the court's instructions properly defined an overt act and the other elements of conspiracy. "By finding appellant guilty of murder, the jurors necessarily agreed that appellant, one of his alleged coconspirators, or all of them, had committed such an act, i.e., "*killed or assisted in killing the victim*." (*People v. Alley*, *supra*, F055786, at p. 14.)

## ALLEY'S SECTION 1170.95 PETITION

The instant appeal is from the denial of Alley's petition for resentencing of his murder conviction, filed in pro. per. on January 6, 2021, pursuant to section 1170.95. Alley requested appointment of counsel.

The petition was supported by Alley's declaration, signed under penalty of perjury, where he checked boxes on a preprinted form that he was entitled to resentencing under section 1170.95 because a complaint or information was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, he was convicted of first or second degree pursuant to the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189 because he was not the actual killer, he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of first degree murder, and he was not a major participant and did not act with reckless indifference.

The parties agree the court did not appoint counsel in this matter.

**The People's Opposition**

On March 11, 2021, the People filed opposition and argued Alley was ineligible for relief because he was convicted of first degree murder based on his intent to kill, pursuant to the language of CALCRIM No. 521, and he was not convicted under the felony-murder rule or the natural and probable consequences doctrine.

25.

As previously noted, the People's opposition included a copy of this court's opinion on direct appeal, and the complete set of printed instructions given at Alley's jury trial that resulted in his murder conviction, as supporting exhibits.

**The Trial Court's Denial of the Petition**

On May 25, 2021, Judge Orozco, who presided over the trial that resulted in Alley's first degree murder conviction, filed an order that denied Alley's section 1170.95 petition. The court held Alley failed to make a prima facie case for relief because he was convicted of first degree murder, he was not convicted under the felony-murder rule or murder under the natural and probable consequences theory, and he was convicted as "a principal in the crime or a direct aider. The jury found the petitioner acted willfully, deliberately, and with intent to kill the victim."

On June 23, 2021, Alley filed a timely notice of appeal.

## DISCUSSION

### I. Section 1170.95

We begin with the provisions and interpretation of section 1170.95.

#### A. *Senate Bill No. 1437*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) became effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now

amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)[8]

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show

---

[8] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not ... previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**B.** *Lewis*

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957, italics added in original.) " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' " (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.) When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at pp. 971.) "While the trial court may look at the record of

conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Lewis, supra*, 11 Cal.5th at p. 971.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972, fn. omitted.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818, if the court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

### C.      Senate Bill No. 775

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020–2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id.*, subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall

issue an order to show cause." (*Ibid.*) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid.*)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (*Id.*, subd. (d)(3).) "At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion.* However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid.*, as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

With this background in mind, we turn to Alley's appellate contentions.

## II. The Court's Failure to Comply With Section 1170.95

The court denied Alley's petition before *Lewis* was decided and section 1170.95 was amended by Senate Bill 775, but the statutory amendments are applicable since this case is not yet final on appeal. (See, e.g., *People v. Vieira* (2005) 35 Cal.4th 264, 306; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306–309.)

Alley filed his section 1170.95 petition using a preprinted form and checked the box requesting appointment of counsel in the case. The parties agree that the court did not appoint counsel before it found Alley failed to make a prima facie case, as required by *Lewis* and section 1170.95, subdivision (b). In addition, the court did not request further briefing from the parties or hold a hearing prior to declining to issue an order to show cause, as required by subdivision (c).

As explained above, the California Supreme Court has held that to demonstrate prejudice from a court's failure to appoint counsel and comply with the provisions of section 1170.95 petition before deciding not to issue an order to show cause, the petitioner must " 'demonstrate there is a reasonable probability that in the absence of the error he … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

Alley argues the court's failure to appoint counsel was prejudicial because counsel could have developed the record to support the petition's allegations to state a prima facie case for relief. While the court complied with subdivision (c) by stating reasons for not issuing an order to show cause, Alley notes the court's order stated it relied on the record of conviction to deny his section 1170.95 petition, and it did not explain what aspects of the record it relied on. Alley asserts the court may have denied relief by making impermissible factual findings based on this court's opinion on direct appeal, which the People filed as an exhibit in opposition to the petition, even though that opinion did not recite the evidence introduced at his trial.

Alley argues the record of conviction includes the charging information that showed Alley was charged with murder based on a felony-murder-rape theory, which further supports the allegations in his section 1170.95 petition. Alley acknowledges the People also filed the jury instructions from his trial in support of the opposition, but asserts these instructions support the allegations in his petition since the aiding and abetting instruction used the disapproved phrase "equally guilty," and there were

instructions on an uncharged conspiracy theory that permitted the jury to convict him of murder based on an imputed malice theory.

Alley thus concludes that the court's failure to appoint counsel was prejudicial because counsel could have filed briefing and fully developed these issues to show that he was convicted of murder based on a now impermissible theory of imputed malice, and remand is required for the court to make the prima facie determination and issue an order to show cause.

## III. The Court's Error Was Not Prejudicial

As clarified by Senate Bill 775's amendments to section 1170.95, "persons convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime ...*" may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.) However, a petitioner is ineligible for resentencing if he was the actual killer; he was not the actual killer but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree; or he was a major participant in the underlying felony and acted with reckless indifference to human life. (§§ 188, subd. (a); 189, subd. (e); 1170.95, subd. (a)(3).)

The prima facie determination under section 1170.95 is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra,* 11 Cal.5th at p. 966.)

The opinion from the petitioner's direct appeal is part of the record of conviction that may be considered to determine whether the petitioner has made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.) However, the role of the appellate opinion is circumscribed. The factual summary contained in an appellate opinion is not considered admissible evidence regarding a petitioner's

33.

resentencing eligibility (§ 1170.95, subd. (d)(3)), and the court may not engage in factfinding based on the appellate opinion at the prima facie stage (*Lewis,* at p. 972).

The court may rely on jury instructions, which are part of the record of conviction, to make the prima facie determination because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, disapproved on another ground in *Lewis*, *supra*, 11 Cal.5th 952.)

As noted by Alley, the People filed this court's opinion on direct appeal in support of its opposition, and, while it did not fully state the underlying facts, it is not clear if the court made any premature factual findings when it denied the petition. While we have set forth the evidence introduced at Alley's trial that resulted in his murder conviction, we have done so only to provide context to the parties' arguments, and do not rely on this factual statement to resolve the prejudice issue.

We find the court's failure to appoint counsel and otherwise comply with section 1170.95 was not prejudicial, and Alley was not eligible for relief as a matter of law. As Alley acknowledges, the procedural record from his direct appeal may be considered in determining prejudice, and we now turn to that record to find the court's failure to comply with section 1170.95 was not prejudicial.

## A.    *CALCRIM Nos. 520 and 521*

Alley argued he was prosecuted under the felony-murder rule based on the charges filed against him. The amended information charged codefendants Alley, Lopez, Molina, and Vargas with count 1, first degree murder of Rice, with the gang special circumstance and the felony-murder-rape special circumstance; count 2, forcible rape; count 3, attempted forcible rape; and count 4, false imprisonment by violence.

The procedural history also shows that at the first jury trial, where the four codefendants were tried together, the jury was instructed on felony murder (CALCRIM Nos. 540A-C) and the natural and probable consequences doctrine (CALCRIM No. 402). Lopez was the only defendant convicted of first degree murder with both special circumstances found true. The jury was unable to reach verdicts on the murder and false imprisonment charges against Alley, and the court declared mistrials on those two counts. The jury also found him not guilty of rape and attempted rape.

At Alley's second jury trial, he was the sole defendant and retried for count 1, first degree murder, and count 4, false imprisonment. The jury was instructed on the gang special circumstance for murder. In contrast to the first trial, however, the jury was not instructed on the felony-murder rule, the felony-murder-rape special circumstance, the natural and probable consequences doctrine, or any underlying target or nontarget offenses aside from the elements of the charged offenses of murder and false imprisonment.

The jury at Alley's second trial received CALCRIM No. 520 on murder, that the People had the burden to prove he "committed an act that caused the death of another person" and when he acted, "he had a state of mind called malice aforethought." CALCRIM No. 521 further stated that he was guilty of first degree murder "if the People have proved that he acted willfully, deliberately, and with premeditation. *The defendant acted willfully if he intended to kill*. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death." (Italics added.) Also as to murder, the jury received CALCRIM No. 625, voluntary intoxication: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way," to decide "*whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation*." (Italics added.)

35.

Alley was convicted of first degree murder, but the jury found the gang special circumstance was not true, and he was found not guilty of false imprisonment.

The entirety of the instructions thus show that Alley was not convicted under the felony-murder rule or the natural and probable consequences theory, and the jury had to find he had the intent to kill.

**B.**     *The Aiding and Abetting Instructions*

Alley asserts the aiding and abetting instructions permitted the jury to convict him of murder based on imputed malice. "Generally, a defendant may be convicted of a crime either as a perpetrator or as an aider and abettor. [Citation.] An aider and abettor can be held liable for crimes that were intentionally aided and abetted (target offenses); an aider and abettor can also be held liable for any crimes that were not intended, but were reasonably foreseeable (nontarget offenses). [Citation.] Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ' " 'natural and probable consequences' doctrine." ' " (*In re Loza* (2018) 27 Cal.App.5th 797, 801, fn. omitted; *People v. Williams* (2015) 61 Cal.4th 1244, 1268.)

Under the direct theory, the prosecution "must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 279.) "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile, supra*, 10 Cal.5th at p. 848.)

Under the indirect theory, where the offense that "the perpetrator actually commits is *different from the originally intended crime*, the natural and probable consequences doctrine limits liability to those offenses that are reasonably foreseeable consequences of the act originally aided and abetted." (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 108, italics added.) Under the natural and probable consequences theory as it previously

applied to aiding and abetting murder, "a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.)

As the trial court found, the instructions given in this case were based on the direct theory of aiding and abetting with the intent to kill, and not on an indirect theory based on target and nontarget offenses. CALCRIM No. 400 stated that Alley could be guilty if he "directly committed" the crime, or if he "aided and abetted a perpetrator, who directly committed the crime." (Italics added.) CALCRIM No. 401 further stated that to convicted Alley under an aiding and abetting theory, the People had to prove the perpetrator committed the crime, "[t]he defendant knew that the perpetrator intended to commit the crime," the defendant *intended* to aid and abet the perpetrator in committing the crime, and the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. (Italics added.)

> "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (Italics added.)

The direct aiding and abetting theory was further expressed in CALCRIM No. 404, that addressed voluntary intoxication and aiding and abetting – that if the jury concluded Alley was intoxicated at the time of the crime, it could consider that evidence to decide whether he "[k]new that Joseph Lopez, Michelle Molina, Elbert Vargas or Sylvester Carter *intended to commit murder*" and he "intended to aid and abet" them "in committing murder." (Italics added.)

It is thus clear that if the jury decided Alley was not the perpetrator but guilty of first degree murder as an aider and abetter, it had to find that he knew the perpetrator intended to commit murder, he intended to aid and abet the perpetrator in committing the murder, and he knew the perpetrator's unlawful purpose and specifically intended to, and

did in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

### C. "Equally Guilty"

Alley argues the "equally guilty" phase in CALCRIM No. 400 was legally erroneous and allowed him to be convicted of murder based on imputed malice. As explained above, this instruction defined direct aiding and abetting and also stated: "A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." (Italics added.)

In *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*), a second degree murder case, the jury asked the court during deliberations if it could find an aider and abettor guilty of a greater or lesser offense than the direct perpetrator. (*Id*. at p. 517.) The trial court responded by rereading CALJIC No. 3.00, that " '[e]ach principal, regardless of the extent or manner of participation, is *equally guilty*.' " (*Nero*, at p. 519, italics added in original.) The trial court also "told the jurors that an aider and abettor 'can bear no greater responsibility as far as the degree.' " (*Id.* at p. 520.)

*Nero* held the trial court committed prejudicial error because it precluded the jury from finding an aider and abettor guilty of a lesser offense than the perpetrator. (*Nero, supra*, 181 Cal.App.4th at p. 520.) By simply rereading the "equally guilty" jury instruction, the trial court erroneously instructed the jury that the aider and abettor necessarily was guilty of the greater offense of second degree murder if the jury found the *perpetrator* was guilty of that offense. (*Id.* at pp. 517–518.) In reaching this holding, *Nero* concluded the "equally guilty" language could be misleading "even in unexceptional circumstances," and the court's decision to respond to the jury's questions by rereading CALJIC No. 3.00 resulted in the misinstructing the jury. (*Id*. at p. 518.)

The possibility that the jury in Alley's case may have relied on an imputed malice theory based on the "equally guilty" phrase is foreclosed by the language in CALCRIM No. 401, that an aider and abettor had to know the unlawful purpose of the perpetrator,

intend to encourage or facilitate the commission of the crime, and by act or advice, aided or encouraged the commission of the crime. Where, as here, the court instructed the jury with CALCRIM No. 401, there is "no reasonable likelihood the jurors would have understood the 'equally guilty' language to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing." (*People v. Johnson* (2016) 62 Cal.4th 600, 641.)

### D. *The Conspiracy Instructions*

Alley next argues the instructions on uncharged conspiracy separately allowed the jury to convict him of first degree murder based on an imputed-malice theory.

"It is firmly established that evidence of conspiracy may be admitted even if the defendant is not charged with the crime of conspiracy." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134.) " 'Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations].' " (*People v. Belmontes* (1988) 45 Cal.3d 744, 788–789, overruled on other grounds by *People v. Cortez* (2016) 63 Cal.4th 101, disapproved of by *People v. Doolin* (2009) 45 Cal.4th 390.)

Evidence of an uncharged conspiracy is relevant to prove criminal liability for acts of coconspirators. (*People v. Valdez* (2012) 55 Cal.4th 82, 150.) When the prosecution has not charged the crime of conspiracy but has introduced evidence of a conspiracy to prove liability for other offenses, the court has a sua sponte duty to instruct on CALCRIM No. 416. (*People v. Williams* (2008) 161 Cal.App.4th 705, 710; *People v. Smother* (2021) 66 Cal.App.5th 829, 870.) The pattern version of CALCRIM No. 416 states that to prove an uncharged conspiracy: (1) the defendant intended to agree and did agree with one or more other people to commit the target crime; (2) at the time of the

agreement, the defendant and the other members of the conspiracy intended that one or more of them would commit the crime; (3) the defendant or the other member(s) of the conspiracy committed an overt act to accomplish the crime; and (4) the overt act was committed in California. (*People v. Smothers,* at p. 870 & fn. 4.)

In *People v. Rivera* (2015) 234 Cal.App.4th 1350 (*Rivera*), the defendant was charged with first degree murder on the theory that he either directly aided and abetted a murder or he was a member of an uncharged conspiracy, the natural and probable consequence of which was murder. (*Id*. at p. 1355.) On the uncharged conspiracy theory of liability, the jury was instructed that it could convict the defendant of first degree murder if it found (1) he conspired to commit the target crimes of murder, attempted murder, robbery, and/or discharge of a firearm at an occupied vehicle, (2) a coconspirator committed the charged crime of first degree murder; and (3) the murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit. (*Ibid.*) The jury found the defendant guilty of first degree murder. (*Ibid*.)

*Rivera* relied on *People v. Chiu* (2014) 59 Cal.4th 155, where the California Supreme Court held that an aider and abettor cannot be convicted of first degree murder under a natural and probable consequences theory, and the aider and abettor's liability for that crime must be based on direct aiding principles. (*Rivera, supra*, 234 Cal.App.4th at pp. 1352, 1356, citing *Chiu, supra*, 59 Cal.4th at pp. 158–159.) Based on *Chiu*, *Rivera* held uncharged conspiracy liability for first degree murder was analogous to aiding and abetting under the natural and probable consequences doctrine. (*Rivera,* at p. 1356.) *Rivera* held that it was error to instruct the jury that it could convict the defendant of first degree premeditated murder if it found that the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime. (*Rivera*, at pp. 1355–1356 & fn. 4.)

*Rivera* explained that under both aider and abettor and uncharged conspiracy theories, "the extension of liability to additional reasonably foreseeable offenses rests on the 'policy [that] conspirators and aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion,' " a theory that was rejected in *Chiu*. (*Rivera, supra*, 234 Cal.App.4th at pp. 1356–1357.) *Rivera* held the instructional error was prejudicial and required reversal of the murder conviction because the jury may have based the verdict on the natural and probable consequences doctrine. (*Id.* at pp. 1357–1358.)

### 1. Analysis

"Under the natural and probable consequences theory of aiding and abetting a murder, a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez, supra*, 22 Cal.App.5th at p. 683.)

As to conspiracy, " '[a] conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy. [Citations.] [¶] Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy.' " (*People v. Joseph* (2021) 63 Cal.App.5th 1058, 1065.) However, "[c]ommission of the target offense in furtherance of the conspiracy satisfies the overt act requirement." (*People v. Jurado* (2006) 38 Cal.4th 72, 121.) Moreover, "[t]he act of one conspirator is the act of all. Each is responsible for everything done by his coconspirators, including those things that follow as the probable and natural consequence of the execution of the conspiracy." (*People v. Zacarias* (2007) 157 Cal.App.4th 652, 657.)

In this case, however, the jury was not instructed on the natural and probable consequences of the uncharged conspiracy theory. Instead, the jury was instructed with

CALCRIM No. 416: "The People contend that the defendant conspired to commit one of the following crimes: Murder or False Imprisonment. You may not find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved the defendant conspired to commit at least one of these crimes, and you all agree which crime he conspired to commit. You must also all agree on the degree of the crime."

The jury was not instructed on any target or nontarget offenses aside from the two charged crimes: count 1, murder, and count 4, false imprisonment. The jury found Alley not guilty of false imprisonment and, as a result, necessarily rejected finding him guilty of murder under the uncharged theory of conspiracy to commit false imprisonment. If the jury relied on the uncharged conspiracy theory to convict Alley of first degree murder, the only way it could have reached that verdict was to rely on the uncharged theory of *conspiracy to commit murder*. "[A] conviction of conspiracy to commit murder requires a finding of intent to kill[.]" (*People v. Swain* (1996) 12 Cal.4th 593, 607.) " '[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641.)

As a result, if the jury convicted Alley of first degree murder based on an uncharged conspiracy theory, the jury necessarily found that *the target offense* of the uncharged conspiracy was first degree murder because it convicted Alley of first degree murder and found him not guilty of false imprisonment. As this court held in Alley's direct appeal, "[b]y finding appellant guilty of murder, the jurors necessarily agreed that appellant, one of his alleged co-conspirators, or all of them, had committed such an act; i.e., 'killed or assisted in killing the victim.'" (*People v. Alley*, *supra*, F055786, at p 14.) Moreover, as explained above, the jury was instructed that if it did not find Alley was the actual killer, it could only convict him of murder under the direct aiding and abetting theory if it found he had the intent to kill Rice.

**E.** *Conclusion*

We thus conclude that Alley was ineligible for resentencing under section 1170.95 as a matter of law based on the instructions given to the jury and the verdicts in this case, and the court's failure to appoint counsel and otherwise comply with the provisions of section 1170.95 when it decided not to issue an order to show cause was not prejudicial.

**DISPOSITION**

The court's order of May 25, 2021, denying Alley's section 1170.95 petition, is affirmed.